**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

ALASKA WILDERNESS LEAGUE;
CENTER FOR BIOLOGICAL
DIVERSITY, INC.; GREENPEACE, INC.;
NATIONAL AUDOBON SOCIETY, INC.;
NATURAL RESOURCES DEFENSE
COUNCIL, INC.; OCEAN
CONSERVANCY, INC.; OCEANA, INC.;
PACIFIC ENVIRONMENT AND
RESOURCES CENTER; REDOIL, INC.;
SIERRA CLUB,
            *Plaintiffs-Appellants*,

                    v.

SALLY JEWELL, Secretary of the
Interior; BRIAN SALERNO, Director
of Bureau of Safety and
Environmental Enforcement; MARK
FESMIRE, Regional Director of
Bureau of Safety and Environmental
Enforcement, Alaska Region,
            *Defendants-Appellees*,

SHELL GULF OF MEXICO INC.; SHELL
OFFSHORE INC.,
    *Intervenor-Defendants–Appellees*.

No. 13-35866

D.C. Nos.
3:12-cv-00048-
RRB
1:12-cv-00010-
RRB

ORDER

Filed December 29, 2015

Before: Jerome Farris, Dorothy W. Nelson,
and Jacqueline H. Nguyen, Circuit Judges.

Order;
Dissent by Judge Gould

**SUMMARY**[*]

**Environmental Law**

The panel denied the petition for panel rehearing, and denied the petition for rehearing en banc on behalf of the court, concerning decisions by the Bureau of Safety and Environmental Enforcement not to engage in consultation pursuant to the Endangered Species Act, and not to prepare an environmental impact statement pursuant to the National Environmental Policy Act, before approving Shell Gulf of Mexico Inc.'s oil spill response plan for offshore drilling in the Beaufort and Chukchi Seas on Alaska's Arctic coast.

Judge Nelson voted to grant the petition for panel rehearing, and recommended granting the petition for rehearing en banc.

Judge Gould, joined by Judges W. Fletcher and Callahan, dissented from the denial of rehearing en banc. Judge Gould wrote that the majority wrongly interpreted the statute that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

governs oil spill response plans, the 1990 amendments to the Clean Water Act, as imposing nondiscretionary duties based on a perceived statutory ambiguity; and in granting the Bureau of Safety and Environmental Enforcement *Chevron* deference on the issue. Judge Gould wrote that this resulted in the majority wrongly narrowing the application of both the Endangered Species Act and the National Environmental Policy Act.

## ORDER

Judges Farris and Nguyen voted to deny the petition for rehearing. Judge Nelson voted to grant the petition for rehearing. Judge Nguyen voted to deny the petition for rehearing en banc, and Judge Farris so recommended. Judge Nelson recommended granting the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED**. No future petitions for rehearing or petitions for rehearing en banc will be entertained.

GOULD, Circuit Judge, with whom W. FLETCHER and CALLAHAN, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I respectfully dissent from denial of rehearing en banc in this case, which concerns decisions by the Bureau of Safety and Environmental Enforcement (BSEE) not to engage in consultation pursuant to the Endangered Species Act (ESA), and not to prepare an environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA), before approving Shell's oil spill response plans for offshore drilling in the Beaufort and Chukchi Seas. The majority's ESA analysis rests first on an erroneous decision to grant BSEE *Chevron* deference, based on the majority's finding an ambiguity in the statute where none exists, and second on an incorrect analogy to *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). The majority incorrectly interpreted the statute that governs oil spill response plans, the 1990 amendments to the Clean Water Act (CWA), as imposing nondiscretionary duties; it granted *Chevron* deference to BSEE on this issue based on a perceived statutory ambiguity. But the statute's clear language demonstrates without ambiguity that BSEE exercises discretion in reviewing and approving oil spill response plans. Both parts of the majority opinion lead to an unprecedented and unwise constraining of the powers of the ESA and NEPA.

The majority's decision in this case encourages federal agencies to abrogate their oversight by deciding that a statute's requirements limit their discretion to the point of taking the ESA and NEPA off the table. The majority invites federal agencies to ignore their ESA and NEPA obligations, await a challenge, and then defend their inaction under the

guise of *Chevron* deference. However, the federal courts should not be so eager to accept, under the guise of *Chevron*, an agency decision that violates existing case law interpreting the ESA and NEPA, as well as the very logic of those statutes. *Chevron* was meant to prevent courts from imposing their own construction of a statute where Congress has not "directly addressed the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Instead, courts should defer to an agency's "permissible interpretation of a statute." *Id. Chevron* was not meant to force courts into deferring to an agency's contention that it lacks discretion over statutorily mandated requirements. Such a ruling invites abrogation of statutory responsibilities.

## I.

A central flaw in the majority's decision is that it finds an ambiguity in 33 U.S.C. § 1321(j)(5) where none exists. According to this statute, part of the 1990 amendments to the CWA passed after the Exxon *Valdez* disaster, an oil company's oil spill response plan must show that the company is capable of "responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." 33 U.S.C. § 1321(j)(5)(A)(i). To comply, the proposed plans must meet six specific requirements. 33 U.S.C. § 1321(j)(5)(D). The statute then directs that the President "shall" take several actions after an oil company submits its plan: "promptly review" it, "require amendments" to a plan that does not meet the statutory requirements, and "approve any plan" that does meet the requirements. 33 U.S.C. § 1321(j)(5)(E). According to the majority, the "shall" language suggests that BSEE "*must* approve" any conforming

plan, and thus has no discretion over the adequacy of the plans. *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1220 (9th Cir. 2015) (emphasis in original). This led the majority to find an ambiguity in the statute: "It is unclear how the broad language of section 1321(j)(5)(A)(i), with its reference to the 'maximum extent practicable,' interacts with the finite statutory criteria of section 1321(j)(5)(D)." *Id.* "And that means we . . . face a statute whose halves do not correspond to each other—giving rise to an ambiguity that calls for *Chevron* deference." *Id.* (quoting *Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2210 (2014)).

However, there is no ambiguity in the statute that warrants *Chevron* deference. The CWA amendments unambiguously give BSEE discretion over oil spill response plan approval. Section 1321(j)(5)(A)(i) requires an oil spill response plan to respond "to the maximum extent practicable to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." According to the majority, "the open-ended nature of [this] phrase . . . suggests agency discretion." *Alaska Wilderness*, 788 F.3d at 1220. The majority agreed with Judge Nelson, who dissented, that this portion of the statute could be read to "serve[] as an independent 'standard' that must be met in addition to the list of enumerated requirements at § 1321(j)(5)(D)." *Id.* at 1222, 1229 (Nelson, J., dissenting) ("[T]he phrase 'maximum extent practicable' . . . has a superlative quality and therefore must refer to the greatest option in a range of possibilities.").

The majority is wrong that the statute's "halves do not correspond to each other." *Id.* at 1220. Like the broad language in § 1321(j)(5)(A)(i), one of the six explicit criteria requires removal of a worst case discharge "to the maximum

extent practicable." 33 U.S.C. § 1321(j)(5)(D)(iii). Accepting the majority's conclusion that this phrase "suggests agency discretion," there is no ambiguity entitling BSEE to *Chevron* deference on the issue of its discretion, because the phrase appears in both parts of the statute. *See Chevron*, 467 U.S. at 842 ("If the intent of Congress is clear, that is the end of the matter . . . ."). The majority ignored that the statute's specific requirements include the same phrase as the statute's introduction, which the majority and dissent agreed suggests agency discretion over response plan approval.

As explained more fully below, this case is unlike *Home Builders* because the statutory duty at issue does not restrict BSEE's discretion over approval of oil spill response plans. The majority makes much of the statute's requirement that BSEE "shall" approve any plan that "meets the requirements of this paragraph," but it ignores the substance of those requirements. 33 U.S.C. §§ 1321(j)(5)(E)(i) & (iii). The requirements do not constitute mere "triggering events," as in *Home Builders*; they require a thorough evaluation of a response plan. *Home Builders*, 551 U.S. at 669.

First, one of statute's explicit requirements is that response plans must "be consistent with the requirements of the National Contingency Plan [NCP] and Area Contingency Plans." 33 U.S.C. § 1321(j)(5)(D)(i). The NCP contains numerous phases of operational responses to a spill, including a special response to worst case discharges, *see* 40 C.F.R. §§ 300.300–300.335, and includes several protections for endangered species. *See, e.g.*, 40 C.F.R. § 300.135(k). The NCP also requires that environmental evaluations "be performed to assess threats to the environment, especially sensitive habitats and critical habitats of species protected

under the [ESA]."      40 C.F.R. § 300.430(e)(2)(i)(G). However, the majority does not explain how BSEE could determine whether a response plan meets the NCP's numerous independent requirements if BSEE's oversight role is truly just to check the boxes in a "checklist." *Alaska Wilderness*, 788 F.3d at 1220. Whether an oil company's oil spill response plan is "consistent with the requirements of the [NCP] and Area Contingency Plans" is far from a mechanical determination or "triggering event[]." *Home Builders*, 551 U.S. at 669.

Second, the CWA amendments require that a company's response plan "remove . . . a worst case discharge," specifically defining the term "remove" to mean "containment and removal of the oil . . . from the water and shorelines or . . . such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including . . . fish, shellfish, wildlife, and public and private property, shorelines, and beaches."      33 U.S.C. § 1321(a)(8). Whether an oil spill response plan provides the means to "remove" a worst case discharge is also a question that requires evaluation of the plan—it is not simply a "triggering event[]." *Home Builders*, 551 U.S. at 669.

Third, other sections of the CWA governing the federal government's spill plans, 33 U.S.C. §§ 1321(d)(1)–(2) & (j)(4)(B)–(D), contain the same "shall" language as the sections governing oil spill response plans, yet are undisputedly subject to ESA consultation.   The majority asserts that "[t]hese provisions . . . are different," but does not say why. *Alaska Wilderness*, 788 F.3d at 1224. The majority tries to distinguish § 1321(d)(1), which requires the President to prepare and publish an NCP, by claiming that "[n]othing in the text prohibits such a plan from being prepared in light

of concerns that an ESA consultation might raise." *Id.* But the majority does not explain why its analysis of the statute at issue here looks for explicit *mention* of ESA consultation whereas its analysis of a parallel provision looks for an explicit *prohibition* on ESA consultation. It is the majority's inconsistent textual analysis, not any meaningful distinction in CWA provisions, that produces these contrary results.

Fourth, the majority attempts to distinguish response plan approval from the NCP, which according to the statute should "include, but not be limited to" a number of factors "that might be deemed necessary after an ESA consultation occurs," including "water pollution control and conservation and trusteeship of natural resources (including conservation of fish and wildlife)." 33 U.S.C. § 1321(d)(2); *Alaska Wilderness*, 788 F.3d at 1224. This argument by the majority apparently is intended to bolster its conclusion that unlike the NCP, 33 U.S.C. § 1321(j)(5)(E) "leaves no room for the inclusion of additional factors." *Alaska Wilderness*, 788 F.3d at 1224. But the majority does not mention that, as explained above, one of the very requirements BSEE must consider before approving an oil spill response plan is its "consisten[cy] with the requirements of the [NCP]." 33 U.S.C. § 1321(j)(5)(D)(i); *Alaska Wilderness*, 788 F.3d at 1224. It is unavailing to distinguish response plan approval from the supposedly more broad-based NCP, when consistency with the NCP is one of the factors to be considered in approving an oil spill response plan.

Fifth, as the dissent explained, BSEE's implementing regulations make clear that the agency can exercise its discretion to benefit protected species. *Alaska Wilderness*, 788 F.3d at 1228 (Nelson, J., dissenting). For example, the regulations require operators to identify resources of

"environmental importance" that could be harmed by a "worst case discharge scenario," and to provide strategies to protect them. 30 C.F.R. §§ 254.26(a), (c). The regulations also require operators to identify procedures to "protect beaches, waterfowl, other marine and shoreline resources, and areas of special . . . environmental importance." 30 C.F.R. § 254.23(g)(4). The majority does not explain how BSEE's cursory review of an oil spill response plan could be consistent with the agency's own regulations. These regulations underscore that § 1321(j)(5)(D) is not just a "checklist statute." *Alaska Wilderness*, 788 F.3d at 1220.

BSEE reasoned that its implementing regulations define "maximum extent practicable" as "within the limitations of available technology, as well as the physical limitations of personnel, when responding to a worst case discharge in adverse weather conditions." 30 C.F.R. § 254.6; Federal Defendants' Opposition to Rehearing En Banc at 12–13. According to BSEE, nothing in this language gives it the discretion to consider a wide range of factors consistent with the general meaning of the word "maximum." *Id.* at 12. That argument persuaded the majority. But Judge Nelson's dissent persuasively explains the unreasonableness of this reasoning. *See Alaska Wilderness*, 788 F.3d at 1229 (Nelson, J., dissenting). Even under BSEE's definition of "maximum extent practicable," BSEE must determine whether Shell's response plans met the standard. And, as even the majority reasoned, the term "maximum extent practicable" "suggests agency discretion because of [its] open-ended nature . . . ." *Id.* at 1220.

Finally, further evidence that the CWA amendments contemplated active review comes from 33 U.S.C. §§ 1321(j)(5)(E)(ii) & (iii), which direct BSEE to "require

amendments to any plan that does not meet the requirements of this paragraph," or to approve a plan that does meet them. That Congress has given BSEE the responsibility to decide whether an oil spill response plan meets the statutory criteria, and has directed the agency to require amendments to nonconforming plans, is further evidence that the statute imparts discretion. Nowhere does the majority explain why Congress would task BSEE with requiring amendments to a nonconforming plan if it truly sought to cabin the agency's discretion or to make the requirements of the CWA amendments mere "triggering events." *Home Builders*, 551 U.S. at 669.

The approval process for oil spill response plans requires agency discretion. It was wrong to grant BSEE *Chevron* deference on this issue.

## II.

Two flawed holdings flow from the majority's erroneous *Chevron* determination. Specifically, the majority narrowed the application of both the ESA and NEPA. First, the majority's approach sets a dangerous precedent for ignoring ESA § 7. Undisputedly, ESA consultation is only required when an agency takes a "discretionary" action. 50 C.F.R. § 402.03. As explained above, however, response plan approval pursuant to the requirements of 33 U.S.C. § 1321(j)(5)(D) is discretionary because it requires BSEE to analyze *whether* the requirements have been met. BSEE should therefore be required to consult under the ESA. The majority concluded otherwise based on its incorrect analogy to *Home Builders*. At issue in *Home Builders* was a requirement in CWA § 402(b) that the Environmental Protection Agency (EPA) "shall approve" a transfer of CWA

permitting authority from the federal government to a state upon a showing that the state had met nine specified criteria.[1] *Home Builders*, 551 U.S. at 650–51. The Supreme Court described the "shall approve" language in CWA § 402(b) as "mandatory" and held that EPA did not have discretion to deny a transfer application. *Id.* at 661. Because the ESA required consultation for all discretionary agency actions, the Court's majority concluded that application of the ESA would impermissibly "engraft[] a tenth criterion onto the CWA." *Id.* at 663. Here, the majority claims that, like CWA § 402(b), the six requirements for response plan approval in 33 U.S.C. § 1321(j)(5)(D) are mandatory, and the ESA is not applicable.

However, this case differs from *Home Builders* for at least three reasons. First, *Home Builders* hinged partially on the fact that the ESA was passed after the CWA, and did not explicitly overrule CWA § 402(b). *Home Builders*, 551 U.S.

---

[1] To become the permitting authority, the state must demonstrate that it has the ability: (1) to issue fixed-term permits that apply and ensure compliance with the CWA's substantive requirements and which are revocable for cause; (2) to inspect, monitor, and enter facilities and to require reports to the extent required by the CWA; (3) to provide for public notice and public hearings; (4) to ensure that the EPA receives notice of each permit application; (5) to ensure that any other State whose waters may be affected by the issuance of a permit may submit written recommendations and that written reasons be provided if such recommendations are not accepted; (6) to ensure that no permit is issued if the Army Corps of Engineers concludes that it would substantially impair the anchoring and navigation of navigable waters; (7) to abate violations of permits or the permit program, including through civil and criminal penalties; (8) to ensure that any permit for a discharge from a publicly owned treatment works includes conditions requiring the identification of the type and volume of certain pollutants; and (9) to ensure that any industrial user of any publicly owned treatment works will comply with certain of the CWA's substantive provisions. 33 U.S.C. §§ 1342(b)(1)–(9).

at 662.  But here, 33 U.S.C. § 1321(j)(5) postdates the ESA by seventeen years.  There is no concern here, as there was in *Home Builders*, that ESA consultation would implicitly amend a prior statute.

The second distinction is that in *Home Builders*, the parties appeared to agree that the state had authority to perform each of the nine enumerated functions in CWA § 402(b).  *Home Builders*, 551 U.S. at 672 ("[T]here is no dispute that Arizona has satisfied each of those statutory criteria"); *see also Alaska Wilderness*, 788 F.3d at 1229 (Nelson, J., dissenting).  The parties' disagreement was instead about whether ESA consultation added an extra step to transfer of permitting authority.  Here, the question is not whether the ESA adds an *extra* step to the approval process, but how much discretion there is in the *existing* steps of 33 U.S.C. § 1321(j)(5)(D).  On this the parties do not agree.  This distinction means that although *Home Builders* is controlling precedent, its particular outcome does not bind this case.

Third, the conditions in § 1321(j)(5)(D) that must be met for response plan approval are substantively different than the conditions for state permitting authority in *Home Builders*.  There, the Supreme Court characterized the conditions as "triggering events" with a mechanical cause and effect.  *Home Builders*, 551 U.S. at 669.  Arizona had to show that it had the ability to perform nine specific tasks.  Once it had done so, the agency had no choice but to transfer CWA permitting authority.  *Id.* at 669.  This reading is consistent with the Supreme Court's conclusion that CWA § 402(b) imposed nondiscretionary requirements on EPA.  *Id.* at 661.  Here, as explained above, the requirements are not simple enough to be considered mere "triggering events."  *Id.* at 669.

They require evaluation of whether an oil spill response plan actually meets, for example, the requirement that it be consistent with the NCP, or the requirement that it ensure the availability of personnel and equipment necessary to remove a worst case discharge to the "maximum extent practicable." 33 U.S.C. §§ 1321(j)(5)(D)(i), (iii).

By not correcting the majority's holding through en banc rehearing, we have permitted a gross alteration of Supreme Court precedent and given federal agencies unwarranted and unprecedented authority over whether their statutory duties are discretionary or not, which directly impacts whether ESA consultation is required. ESA consultation is required for "any action authorized, funded, or carried out by" a federal agency—with the rare exception for cases such as *Home Builders*, where a statute's requirements are clearly "triggering events" rather than independent requirements, and where there is no dispute that the requirements have been met. Neither is true of the statute at issue here, 33 U.S.C. § 1321(j)(5). This is clear from the statute itself, and the majority was wrong to adopt the agency's contrary interpretation under the guise of *Chevron*.

The majority's decision also misapplies NEPA precedent. NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In a narrow exception, NEPA does not apply where an agency lacks the discretion to consider environmental values in its decision making process. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767–69 (2004). Here, the majority held that BSEE reasonably concluded that it "must approve any [response plan] that meets the statutory requirements." *Alaska Wilderness*, 788 F.3d at 1225. "Thus, even assuming,

without deciding, that BSEE's approval of Shell's [response plans] constitutes a 'major Federal action,' its approval is not subject to NEPA's requirements." *Id.* The majority analogized this case to *Public Citizen*, where the governing statute required the Federal Motor Carrier Safety Administration (FMCSA) to register a person to provide transportation as a motor carrier if it found the person willing and able to comply with the statute's requirements. *Public Citizen*, 541 U.S. at 766. NEPA review was not required in *Public Citizen* because the agency lacked the power to consider environmental consequences outside its statutory obligation. *Id.* at 768–70.

The majority's analogy to *Public Citizen* is unsupported. As explained above, § 1321(j)(5)(D) imposes a discretionary duty on BSEE. In *Public Citizen*, the Supreme Court held that FMCSA did not have to account for certain environmental effects in its environmental assessment because it had "no ability to countermand" executive action by the President, so its action did not have a "reasonably close causal relationship" to any negative environmental impacts. *Public Citizen*, 541 U.S. at 766–67. That is not the case here, because BSEE does have the authority to consider environmental values in its decision-making process. BSEE's approval of response plans is discretionary, and it would provide a "reasonably close causal relationship" between the agency action and environmental effects, including a "worst case discharge," stemming from a potential spill. *See Public Citizen*, 541 U.S. at 767; 33 U.S.C. § 1321(j)(5)(A)(i).[2]

---

[2] Deference to BSEE's views may also be tempered here because we are assessing whether BSEE's review and approval of an oil spill response plan under the CWA is non-discretionary *within the meaning of NEPA*. As the D.C. Circuit has explained, "the court owes no deference to the

In sum, the impact of the majority's decision is to take the ESA and NEPA off the table when considering oil spill response plans, which are a required component of offshore drilling proposals. This violates the language of 33 U.S.C. § 1321(j)(5), which by its terms requires discretionary evaluation of oil spill response plans. The statute calls on BSEE to assess whether response plans give protection to the "maximum extent practicable." 33 U.S.C. § 1321(j)(5)(A)(i). A federal agency cannot determine if protection is to the "maximum extent practicable" without exercising some discretion in judgment. If discretion is needed, then claimants with standing, and the federal courts, must be part of the approval process until decisions are made in litigation.

III.

I agree with the majority that the ESA and NEPA do not require an agency to provide redundant analysis. NEPA and its implementing regulations accommodate this concern by allowing agencies to take a "tiered" approach to environmental review. *See* 40 C.F.R. § 1502.20 (encouraging tiering of NEPA review). We have also allowed for tiering of ESA review. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067–68 (9th Cir. 2004). Thus, BSEE's NEPA and ESA review of the proposed

---

[agency's] interpretation of NEPA . . . because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to [BSEE] alone." *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 342 (D.C. Cir. 2002). Moreover, Congress demonstrated in the CWA that it knows how to exempt agency approvals from environmental review. *See* 33 U.S.C. § 1371(c) (exempting certain actions by EPA from NEPA review). That Congress did not similarly exempt BSEE's oil spill response plan approval, pursuant to the CWA, from NEPA or ESA review strongly suggests that Congress intended the statutes to apply.

approval of Shell's oil spill response plans need not be burdensome or redundant if the foreseeable impacts of approving the plans, and reasonable alternatives, were already addressed in an EIS and biological opinion completed at an earlier stage of development. If this were the case, BSEE could, for example, prepare a shorter environmental assessment tiered to the earlier EIS to satisfy NEPA. *See* 40 C.F.R. § 1508.9 (describing an environmental assessment). Here, the majority does not address whether BSEE satisfied NEPA and the ESA through tiered environmental review. Rather, the majority rules that oil spill response plan approval is exempt from the ESA and NEPA altogether.

It is true that BSEE reviewed Shell's oil spill response plans only after other higher-level planning activities, including preparing an EIS for each of its five-year leasing programs and preparing a biological opinion evaluating the likelihood that drilling will jeopardize species protected by the ESA. *See, e.g.*, NMFS, Beaufort and Chukchi Seas Biological Opinion, http://goo.gl/YECHFu. But an oil spill response plan may raise significant environmental risks beyond those analyzed at a granular level at a previous stage of development. For example, alternative means of containing an oil spill, such as the controversial use of dispersants, may themselves significantly impact listed species, other environmental resources, and the safety of first responders and the public to varying degrees. Review of these risks and of alternative response actions would not be redundant or duplicative if they were not considered in a previous EIS and biological opinion. Indeed, the higher planning levels govern the whole gamut of offshore drilling operations. Oil spill response plans—while nominally a "lower," implementation-level action—are the first component to be deployed when a spill actually happens. It

is ill-advised for the court to accept, under the guise of *Chevron*, BSEE's refusal to complete NEPA and ESA review of these plans, especially since these plans may not be as effective in redressing spills and preserving the environment as they could be with environmental review of alternatives and input from federal wildlife agencies.

I also emphasize this case's importance notwithstanding Shell's recent suspension of its Arctic drilling program. Although the program is on hold, and the administration has recently canceled existing Arctic lease sales, oil markets are cyclical and it is all but certain that higher future oil prices, a warming Arctic, or both will once again make drilling in the Arctic cost-effective. The Department of the Interior's latest five-year drilling plan still includes offshore lease sales in Alaska. Whenever Shell begins its Arctic drilling permitting process again, BSEE will give Shell's oil spill response plans the same cursory review it did here. If this case is not corrected by Supreme Court review, it will have two severe consequences. First, it will preclude judicial review of oil spill response plans when Shell's Arctic drilling plans resume. In light of BSEE's obvious reluctance to give the term "maximum extent practicable" its natural meaning in 33 U.S.C. §§ 1321(j)(5)(A)(i) & (j)(5)(D)(iii), it is undeniable that Shell's oil spill response plans will not be as responsive to the needs of endangered and threatened species as they would be with ESA consultation. And it is all but certain that BSEE's review of the response plans—the first line of defense in the event of a major oil spill—will be far more cursory than it would be if the public process, review of foreseeable impacts, and consideration of alternatives necessary under NEPA were provided.

Second, and equally important, our court now has chosen to accept an agency's own opinion about the scope of its discretion in order to make this case fit into the narrow exceptions of *Home Builders* and *Public Citizen*. By ignoring our proper role in this litigation, we have enabled BSEE's abrogation of its oversight role over response plan approval, and we have invited other federal agencies to do the same any time a statutory duty could arguably be cast as "mandatory" or "nondiscretionary." The message we send to agencies, and to oil companies, is "we trust you and will rely on your judgment without review by federal agency experts and public input." This is not the role envisioned by Congress when it passed the 1990 CWA amendments, which require an oil spill response plan to demonstrate its ability to respond, "to the maximum extent practicable, to a worst case discharge," or when it passed the ESA, which requires "[e]ach Federal agency" to consult with federal wildlife agencies to "insure that any action authorized, funded, or carried out by such agency" is not likely to jeopardize protected species or adversely modify their critical habitat. 33 U.S.C. § 1321(j)(5)(A)(i); 16 U.S.C. § 1536(a)(2). It is not the role envisioned by NEPA, which mandated that "all agencies" shall utilize a "systematic, interdisciplinary approach" in planning and decision making, and shall prepare an EIS for all major federal actions significantly affecting the human environment, which include "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332. It is not the role for the courts *Chevron* envisioned by approving deference to an agency's "permissible construction of the statute" only in response to statutory ambiguity. *Chevron*, 467 U.S. at 843.

Although this case deals with a complicated regulatory framework, at bottom it turns on simple answers to simple questions: If an oil company submits an oil spill response plan to BSEE, does the federal government have discretion to consider alternative response actions in order to ensure that any approved plan responds to a worst case spill to the maximum extent practicable?  Could alternative methods of responding to a spill themselves have varying impacts on listed species that now thrive in the Beaufort and Chukchi Seas, such as the bowhead whale, the humpback whale, the bearded seal, and the Steller sea lion, as well as other aspects of the human environment?  *See* BOEM Biological Opinion, Lease Sale 193, http://goo.gl/YECHFu.  If such dangers and alternative courses of action are present, is it the aim of Congress to have the agency that oversees drilling perform public environmental review of the proposed plan and consult with federal agencies that oversee listed species?  If Congress has required that an oil spill response plan must respond to the spill to the maximum extent practicable, will that not require a discretionary judgment of the regulating agency, here the Bureau of Safety and Environmental Enforcement?  The answers to these questions are "yes."  Only if BSEE scrutinizes whether an oil spill response plan gives protection to the maximum extent practicable will our treasured public trust resources be protected to the maximum extent practicable.

By not correcting the majority's holding through en banc review, we have let stand a decision that misapplies core principles of administrative and environmental law, and have set a dangerous precedent of deferring to a federal agency's view of its own discretion, even when a statute is not ambiguous.  I respectfully dissent.