RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

NATIONAL WILDLIFE FEDERATION,

*Plaintiff-Appellee*,

*v.*

SECRETARY OF THE UNITED STATES DEPARTMENT OF
TRANSPORTATION; ADMINISTRATOR OF THE PIPELINE
& HAZARDOUS MATERIALS SAFETY ADMINISTRATION,
in their official capacities (19-1609),

*Defendants-Appellants*,

ENBRIDGE ENERGY, LIMITED PARTNERSHIP (19-1610),

*Intervening Defendant-Appellant*.

Nos. 19-1609/1610

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10031—Mark A. Goldsmith, District Judge.

Argued: April 9, 2020

Decided and Filed: June 5, 2020

Before: MERRITT, THAPAR, and LARSEN, Circuit Judges.

―――――――――

## COUNSEL

**ARGUED:** Jeffrey Bossert Clark, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Federal Appellants. David H. Coburn, STEPTOE & JOHNSON LLP,
Washington, D.C., for Appellant Enbridge. Oday Salim, UNIVERSITY OF MICHIGAN LAW
SCHOOL, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Jeffrey Bossert Clark, Avi Kupfer,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellants.
David H. Coburn, Joshua H. Runyan, STEPTOE & JOHNSON LLP, Washington, D.C., Phillip
J. DeRosier, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellant Enbridge. Oday
Salim, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellee.

Kirsten L. Nathanson, CROWELL & MORING LLP, Washington, D.C., Bruce T. Wallace, HOOPER HATHAWAY, P.C., Ann Arbor, Michigan, Ann Alexander, NATURAL RESOURCES DEFENSE COUNCIL, San Francisco, California, Lindsay P. Dubin, DEFENDERS OF WILDLIFE, Washington, D.C., Ross A. Hammersley, OLSON, BZDOK & HOWARD, P.C., Traverse City, Michigan, for Amici Curiae.

THAPAR, J., delivered the opinion of the court in which LARSEN, J., joined. MERRITT, J. (pp. 12–15), delivered a separate dissenting opinion.

---------------

**OPINION**

---------------

THAPAR, Circuit Judge.  Discretion and judgment are not the same thing.  The question here is whether an agency has discretion to consider environmental criteria not listed in a statute simply because the agency exercises some degree of judgment when it considers the statutory criteria.  The district court thought that to be so and ordered the agency to comply with the Endangered Species Act and National Environmental Policy Act.  We see things differently and reverse.

This case is about an oil pipeline called "Line 5."  For over sixty years, Line 5 has carried oil across the Great Lakes region.  Beginning in northwestern Wisconsin, the pipeline stretches into the Upper Peninsula of Michigan, takes a right turn at the Straits of Mackinac, and cuts down through the Lower Peninsula before ending in southwestern Ontario.

The Clean Water Act, as later amended, requires the operators of oil pipelines to submit response plans that address the risk of a potential oil spill.  33 U.S.C. § 1321(j)(5)(A)(i); 49 C.F.R. § 194.101(a).  These plans must satisfy the following six criteria enumerated in the statute:

> (i) be consistent with the requirements of the National Contingency Plan and Area Contingency Plans;

> (ii) identify the qualified individual having full authority to implement removal actions, and require immediate communications between that individual and the appropriate Federal official and the persons providing personnel and equipment pursuant to clause (iii);

(iii) identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge;

(iv) describe the training, equipment testing, periodic unannounced drills, and response actions of persons on the vessel or at the facility, to be carried out under the plan to ensure the safety of the vessel or facility and to mitigate or prevent the discharge, or the substantial threat of a discharge;

(v) be updated periodically; and

(vi) be resubmitted for approval of each significant change.

33 U.S.C. § 1321(j)(5)(D). The Act also provides that the administering agency "shall . . . approve any plan" that satisfies the enumerated criteria. *Id*. § 1321(j)(5)(E)(iii).

Over the past five years, the operator of Line 5 (Enbridge Energy) has submitted two different response plans as required by the Clean Water Act. The administering agency (here, the Pipeline and Hazardous Materials Safety Administration) evaluated these plans, determined each plan met the enumerated criteria, and thus approved them both.

The National Wildlife Federation then sued, alleging that the agency had violated the Clean Water Act and various other statutes. As relevant here, the district court found that the response plans satisfied the enumerated criteria. But the court granted summary judgment to the Federation on other grounds, holding that the agency had to comply with the Endangered Species Act and the National Environmental Policy Act before it could approve the plans. We review the district court's decision de novo. *See Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016).

*Endangered Species Act.* The defendants first challenge the district court's ruling as to the Endangered Species Act. That Act requires federal agencies to consult with the appropriate environmental authorities in order to "insure that any [agency] action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). But importantly, the consultation requirement does not apply to *all* agency actions; it applies only to "discretionary" ones. 50 C.F.R. § 402.03; *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652, 669 (2007).

The Supreme Court explained the meaning of the term "discretionary" in *Home Builders*. Like this case, that case involved a provision of the Clean Water Act. And like the provision here, the provision there provided that an agency "shall" take an action—namely, transfer certain permitting powers to state authorities—if nine enumerated criteria were met. 33 U.S.C. § 1342(b); *Home Builders*, 551 U.S. at 650–51. The Court found that the action was not "discretionary" because "the statutory language [was] mandatory and the list exclusive." *Home Builders*, 551 U.S. at 661. The statute did "not just set forth *minimum* requirements for the transfer of permitting authority; it affirmatively mandate[d] that the transfer 'shall' be approved if the specified criteria are met." *Id.* at 663. And in this way, the criteria "operate[d] as a ceiling as well as a floor." *Id.* In short, the consultation requirement did not apply because the action was something that the agency was "*required* by statute" to do "once certain specified triggering events ha[d] occurred." *Id.* at 669.

All the same holds true here. The Clean Water Act provides that the agency "shall" approve any response plan that meets the requirements of the Act. 33 U.S.C. § 1321(j)(5)(E)(iii). Like in *Home Builders*, "the statutory language is mandatory." *Home Builders*, 551 U.S. at 661. The Act also enumerates six criteria that response plans must satisfy. 33 U.S.C. § 1321(j)(5)(D). Again, like in *Home Builders*, the list is "exclusive" and "operates as a ceiling as well as a floor." *Home Builders*, 551 U.S. at 661, 663. Thus, like in *Home Builders*, the agency is "*required* by statute" to approve the response plan once the "triggering events have occurred." *Id.* at 669. Indeed, even the district court and the Federation have recognized as much. R. 78, Pg. ID 2225 (recognizing that the agency cannot "disapprove a response plan that meets the relevant criteria"); Appellee Br. at 54 (describing the action as "mandatory" once the relevant criteria have been met). By all appearances, then, the action here isn't "discretionary."

The Federation pushes back on this conclusion in several ways.

The Federation primarily argues that the agency has "discretion" because it exercises some degree of "judgment" when it evaluates the enumerated criteria. But *Home Builders* squarely forecloses this reasoning. Both the plaintiffs and the dissent in that case tried the same argument, reasoning that the agency action was "discretionary" because it wasn't "entirely

mechanical" and involved "some exercise of judgment." *Home Builders*, 551 U.S. at 671; *see id.* at 691–92 (Stevens, J., dissenting). Yet the majority rejected the "some judgment" theory out of hand. *Id.* at 671 (majority opinion).

To be sure, *Home Builders* didn't draw a precise line between "discretion" and "judgment." But the basic distinction isn't all that mysterious. Some examples may help to show the difference. The clearest case of "discretion" is when an agency doesn't have to act—for instance, if a statute says "may" rather than "must" or "shall." *See, e.g.*, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018) ("The use of the word 'may' certainly confers discretion on the [agency]."). Beyond that, some courts have found even mandatory actions to be "discretionary" under the Endangered Species Act (and related statutes) when the statutory criteria are so open-ended that they leave the agency significant flexibility on *when* or *how* to act. *See, e.g.*, *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) ("public convenience and necessity"); *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1142 (11th Cir. 2008) ("'otherwise improve' land management and use"). But on the other hand, *Home Builders* makes clear that agency action need not be "entirely mechanical" for the agency to still be exercising only "judgment," not "discretion." *Home Builders*, 551 U.S. at 671.

Or consider some analogous examples from a more familiar context. Just like agencies, district courts can have "discretion" because permissive language gives it to them. *See, e.g.*, *Dorris v. Absher*, 179 F.3d 420, 429 (6th Cir. 1999) (applying the general rule that the term "may" gives the district court "discretion" to act). But district courts can *also* have "discretion" because the criteria governing their action (even a mandatory action) are simply too open-ended to be anything but "discretionary." Take the Federal Rule on discovery: courts "must" limit discovery to "the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii). That sounds nondiscretionary until you look at Rule 26(b)(1), which defines the scope of discovery only in terms of a broad list of open-ended factors courts must "consider[]." It should come as no surprise then that "the scope of discovery is within the sound discretion of the trial court." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642 (6th Cir. 2018) (cleaned up). Yet this does not mean that *any* amount of open-endedness makes a decision "discretionary." District courts make tough calls on a daily basis. Most motions to dismiss or for summary judgment, for

example, call on district courts to exercise their judgment and expertise. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (noting that "whether a complaint states a plausible claim for relief" calls for "judicial experience and common sense"). But of course, we don't consider all these decisions "discretionary."

As with most legal issues, there may be close cases in which it isn't entirely clear whether an action involves "discretion" or only "judgment." But fortunately, this case isn't one of them. In the Clean Water Act, Congress gave the agency specific "instructions" (the enumerated criteria) and told the agency "to follow the instructions" ("shall . . . approve"). 33 U.S.C. § 1321(j)(5)(D), (E)(iii); *WildEarth Guardians v. U.S. Army Corps of Eng'rs*, 947 F.3d 635, 640 (10th Cir. 2020). The criteria here are akin to those at issue in *Home Builders*, which also required the agency to use some expertise and judgment, but yet did not trigger the consultation requirement. *See Home Builders*, 551 U.S. at 671. And *Home Builders* flatly tells us that in such cases an agency action isn't "discretionary" because it's something the agency is "*required* by statute to [do] once certain specified triggering events have occurred." *Id.* at 669. No different here

The Federation next tries to find discretion in various provisions of the Clean Water Act. For instance, it points to a provision that directs the agency to "require amendments to any plan that does not meet the requirements of this paragraph." 33 U.S.C. § 1321(j)(5)(E)(ii). But the power to "amend" is the power "to put right" or "correct." *The Random House Dictionary of the English Language* 66 (2d ed. 1987); *Webster's Third New International Dictionary* 68 (1993). And the Clean Water Act already provides a clear standard by which to evaluate the "correctness" of the plans: the criteria enumerated in the statute. So this provision gives the agency no more discretion than the enumerated criteria themselves. That is to say, none at all.

Nor does it matter that the agency must issue regulations requiring response plans to address the risk of oil spills "to the maximum extent practicable." 33 U.S.C. § 1321(j)(5)(A)(i). The Clean Water Act clearly specifies the information that plans must include. *See id.* § 1321(j)(5)(D). And even the Federation does not argue that the Act's grant of rulemaking authority empowers the agency to "engraft[]" additional criteria onto that list. *Home Builders*,

551 U.S. at 663. After all, rulemaking authority "is not the power to *make* law" (at least in the full sense of that term) but only "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134 (1936) (emphasis added). So again, this provision gives the agency no more discretion than the enumerated criteria themselves.

The Federation also seeks meaning in two of the enumerated criteria, arguing that they incorporate environmental concerns that trigger the consultation requirement. But the Supreme Court considered (and rejected) a nearly identical argument in *Home Builders*, reasoning that none of the criteria made the protection of endangered species "an end in itself." *Home Builders*, 551 U.S. at 671. The argument fails for the same reason here.

The Federation points to a criterion that requires response plans to ensure the availability of "private personnel and equipment necessary to remove to the maximum extent practicable" certain oil spills. 33 U.S.C. § 1321(j)(5)(D)(iii). The Clean Water Act further defines "remove" and "removal" as the various actions that "may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." *Id.* § 1321(a)(8). The Federation seizes upon the words "fish," "shellfish," and "wildlife" and insists that they show that the requirement implicates environmental concerns. But those words are just a few examples given to show what the phrase "the public health or welfare" means in the "removal" context. More relevant here, the "removal" definition simply modifies the type of "personnel" and "equipment" that the pipeline operator must have. The key provision thus asks whether the operator has the type of *resources* necessary to address certain oil spills "to the maximum extent practicable"—a question of technical and practical limits. *See* 49 C.F.R. §§ 194.5, 194.115(a). Given all this, it's hard to see how the provision treats the protection of endangered species as "an end in itself." *Home Builders*, 551 U.S. at 671.

The Federation also points to a criterion that requires response plans to be "consistent with the requirements of the National Contingency Plan and Area Contingency Plans." 33 U.S.C. § 1321(j)(5)(D)(i). These contingency plans—as explained elsewhere in the Clean

Water Act—are prepared by government officials and describe how public and private entities should work together to prevent and remedy oil spills. *See id*. § 1321(d), (j)(4). The Federation reasons that, because the response plans must be "consistent with" the contingency plans and because the contingency plans allegedly incorporate environmental concerns, then the response plans must incorporate such concerns as well. But this extended chain of reasoning doesn't hold up.

For one thing, the phrase "consistent with" cannot bear the weight that the Federation places on it. Response plans are "consistent" with the contingency plans if they "show[] no noteworthy opposing, conflicting, inharmonious, or contradictory qualities"—in other words, if the documents put together are "not self-contradictory." *The Random House Dictionary of the English Language* 434; *Webster's Third New International Dictionary* 484. Consistency does *not* mean exact, point-by-point correspondence. *See, e.g.*, *Envtl. Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam); *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898–99 (9th Cir. 1986). So this provision doesn't require response plans to incorporate every single feature of the contingency plans—a conclusion that the agency has also reached. *See* 49 C.F.R. § 194.107(b).

In any event, the Federation overstates the relevance of the provision. The organization points to a single regulation that requires Area Contingency Plans to include an "annex" and says that the annex should "[d]efine the requirements for evaluating the compatibility between this annex and non-federal response plans . . . on issues affecting fish and wildlife, their habitat, and sensitive environments." 40 C.F.R. § 300.210(c)(4)(i), (ii)(I). And the relevant annex provides that pipeline operators "must determine the maximum distance at which a worst case oil spill from their facility could cause injury to fish and wildlife and sensitive environments and develop a plan for mitigating that discharge's potential adverse effects." Fish & Wildlife Annex Region 5, pt. I, § 10.0 (2008). Again, it's hard to see how a single sentence in an annex based on a regulation associated with a statutory provision means that the provision, on its own terms, treats the protection of endangered species "as an end in itself." *Home Builders*, 551 U.S. at 671. But just as importantly, this argument runs up against the principle that Congress doesn't hide

regulatory elephants (like the consultation requirement) in mouseholes. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). And mouseholes don't get much smaller than this.

As a last resort, the Federation cites the Clean Water Act's purpose as well as some snippets of legislative history. But courts don't consider this type of "extra-textual evidence" when the statutory text is clear—as it is here. *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 942 (2017). So this argument fares no better than the rest.

In sum, the agency did not need to comply with the consultation requirement.

*National Environmental Policy Act.* The defendants also challenge the district court's ruling as to the National Environmental Policy Act. That Act requires federal agencies to prepare an environmental impact statement for major federal actions that will affect the environment. 42 U.S.C. § 4332(C). But like the consultation requirement, the impact-statement requirement does not apply to *all* major agency actions; it applies only to discretionary ones. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004); *Pac. Legal Found. v. Andrus*, 657 F.2d 829, 835–40 (6th Cir. 1981).

Consider the Supreme Court's decision in *Public Citizen*. There, the Court held that an agency need not prepare an impact statement for an action that it "lacks discretion to prevent." *Pub. Citizen*, 541 U.S. at 756. That holding followed from two simple points. First, the National Environmental Policy Act contains an inherent "rule of reason." *Id.* at 767. And "no rule of reason worthy of that title," the Court observed, would require an agency to prepare an impact statement to address "the environmental impact of an action it could not refuse to perform." *Id.* at 767, 769. Second, the Act requires "a reasonably close causal relationship" between the environmental impact and the agency action—something akin to proximate causation. *Id.* at 767. And when an agency lacks discretion, "the legally relevant cause" of the environmental impact, the Court explained, is not the agency's action but rather Congress's decision to limit the agency's discretion in the first place. *Id.* at 769. To sum up, the impact-statement requirement did not apply because the agency had "no discretion" to act otherwise. *Id.* at 770; *see also Home Builders*, 551 U.S. at 667–68 (describing the "basic principle" of *Public Citizen* as being "that an

agency cannot be considered the legal 'cause' of an action that it has no statutory discretion *not* to take").

Again, the same holds true here. The Clean Water Act doesn't allow the agency to reject a response plan for "any reason under the sun." *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1298 (11th Cir. 2019). Rather, the Act *requires* the agency to approve any plan that satisfies the enumerated criteria. Like in *Public Citizen*, it makes little sense to compel the agency to prepare an impact statement for "an action it [cannot] refuse to perform." *Pub. Citizen*, 541 U.S. at 769. And, like in *Public Citizen*, "the legally relevant cause" of any environmental impact isn't the agency's approval of the response plan but rather Congress's decision to limit the agency's discretion in the first place. *Id.* Thus, like in *Public Citizen*, the impact-statement requirement does not apply because the agency had "no discretion" to act otherwise. *Id.* at 770; *see also Andrus*, 657 F.2d at 835–36, 838–39 (holding that the impact-statement requirement did not apply because the statute required the agency to consider five enumerated factors and the action was "mandatory" rather than "discretionary").

Nor do the enumerated criteria allow the agency to make free-form environmental decisions. That certain criteria might have environmental effects doesn't mean that they allow the agency to consider the environment as "an end in itself." *Cf. Home Builders*, 551 U.S. at 671. And if parties have a problem with the review of a response plan, our court has made clear that the solution is a challenge to the review decision itself, not a "collateral attack to require an impact statement." *Andrus*, 657 F.2d at 836–37. In fact, the Federation brought such a challenge in this case, arguing that the response plans didn't satisfy the enumerated criteria and that the agency failed to adequately explain its decision. The district court rejected the first argument and accepted the second. But neither party has appealed those rulings, and the National Environmental Policy Act doesn't create a backdoor to litigate the same issues all over again.

The Federation repeats many of the same arguments about the agency's supposed "discretion." But the arguments fail with respect to the National Environmental Policy Act for the same reasons they fail as to the Endangered Species Act. *See Sierra Club v. Babbitt*, 65 F.3d

1502, 1512 (9th Cir. 1995); *see also Home Builders*, 551 U.S. at 667–68 (analogizing discretion under the two statutes). The Federation hasn't given us any reason to think otherwise.

In sum, the agency did not need to prepare an impact statement.

One last point. The only other circuit to address these two issues reached the same result but through different reasoning. *See Alaska Wilderness League v. Jewell*, 788 F.3d 1212 (9th Cir. 2015). That court likewise held that an agency need not comply with the Endangered Species Act or the National Environmental Policy Act before it approves a response plan. But the court did so only after it found the Clean Water Act ambiguous and the agency's interpretation reasonable. *See id*. at 1219–26 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

As an initial matter, it seems doubtful that the *Chevron* framework applies here at all. Agency interpretations warrant *Chevron* deference only when they are issued through an action carrying the "force of law"—such as a regulation or formal adjudication. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013). And the parties haven't pointed us to any such interpretation. But in any event, courts don't defer when the statutory text is clear. *See Arangure v. Whitaker*, 911 F.3d 333, 337–38 (6th Cir. 2018). So deference is beside the point.

\*\*\*

We reverse the district court's judgment as to the claims under the Endangered Species Act and the National Environmental Policy Act and remand for further proceedings consistent with this opinion.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting.  The record reflects that from 1999 to 2016 there were at least 269 oil spills or leaks from the defendant, Enbridge Energy, resulting in over three million gallons spilled.  Given the potential for environmental damage that each spill creates, the question before us, based upon the language of the statutes to be interpreted, is whether we should take a narrow or broad view of the wildlife and other environmental resources that should be protected.  My colleagues take an extremely narrow view.  The district court took a broader view with which I agree.

This case deals with a set of complicated regulations asking an administrative agency to take into account and weigh and balance a long list of considerations named in 33 U.S.C. § 1321(j)(5)(D) and the definition section.  It is unrealistic to think that it can perform its role without the kind of flexible judgement or guided discretion that we as judges must often use in weighing similar kinds of issues.

The Endangered Species Act requires federal agencies to consult with environmental authorities to insure that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify the habitat of such species.  16 U.S.C. § 1536(a)(2).  This consultation requirement applies only to "discretionary" agency actions.  50 C.F.R. § 402.03.  When we read the six criteria recited in 33 U.S.C. § 1321(j)(5)(D),[1] together with the definition section found in § 1321(a), it seems clear that

---

[1]The response plan must:

    (i)     be consistent with the requirements of the National Contingency Plan and Area Contingency Plans;

    (ii)    identify the qualified individual having full authority to implement removal actions, and require immediate communications between that individual and the appropriate Federal official and the persons providing personnel and equipment pursuant to clause (iii);

    (iii)   identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge

Congress intended to give the administrative agency that rules on response plans (here, the Pipeline and Hazardous Material Safety Administration) significant discretion or latitude in considering and applying the criteria. Perhaps the most obvious criteria that calls for a broad view is § 1321(j)(5)(D)(iii):

> identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary <u>to remove to the maximum extent practicable</u> a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge.

*Id.* (emphasis added). The definition section gives the word "remove" a broad definition that extends the administrative agency's discretion to include not only the "public health or welfare" but also "wildlife" and damage to the "public and private property." This definition section reads as follows:

> "[R]emove" or "removal" refers to containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other action as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines and beaches[.]

§ 1321(a)(8). In addition, "maximum extent practicable" means "the limits of available technology and the practical and technical limits on a pipeline operator[.]" 49 C.F.R. § 194.5.

The agency here must therefore decide if response plans provide the means necessary to, within the confines of available technology and other limitations, "prevent, minimize, or mitigate damage to the public health or welfare," which includes environmental concerns. This decision-

---

(including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge;

(iv)    describe the training, equipment testing, periodic unannounced drills, and response actions of persons on the vessel or at the facility, to be carried out under the plan to ensure the safety of the vessel or facility and to mitigate or prevent the discharge, or the substantial threat of a discharge;

(v)    be updated periodically; and

(vi)    be resubmitted for approval of each significant change.

§ 1321(D)(i)–(vi).

making involves expertise, discretion, and judgment. The agency does not simply check the box for a "triggering event" like the agency in *Home Builders*.

In *Home Builders*, the Court did not require consultation under the Endangered Species Act in part because doing so would implicitly repeal the Clean Water Act. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661–64 (2007). We do not have that problem here, as Congress enacted the Oil Pollution Act of 1990 after the Endangered Species Act. *See Alaska Wilderness League v. Jewell*, 811 F.3d 1111, 1116 (9th Cir. 2015) (explaining that "33 U.S.C. § 1321(j)(5) postdates the ESA by seventeen years") (Gould, J., dissenting). Additionally, the criteria in *Home Builders* were specific and finite and operated "as a ceiling as well as a floor." *Home Builders*, 551 U.S. at 663.[2] Here, the "maximum extent practicable" requirement is an amorphous, moving target, subject to change with the development of technology and other resources used by pipeline operators. Hence the agency's mandate to periodically review response plans to ensure that operators use the best available methods at that point in time and the agency's ability to force operators to amend the plan if they do not meet that criterion. 33 U.S.C. § 1321(j)(5)(E)(ii), (iv). The agency's mandate to periodically evaluate and amend response plans are other examples of the expertise and latitude required by the agency, and is much different than the agency's role in *Home Builders*, which the Court determined was to check boxes for a series of "triggering events." *Home Builders*, 551 U.S. at 669.

The National Environmental Policy Act requires federal agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i). My colleagues rely on *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004), to support the position that the agency here did not have to prepare an environmental impact statement. In *Public Citizen*, the agency was required to certify a person as a motor carrier if it found that person willing and able to comply with safety and financial responsibility requirements established by the Department of Transportation. *See* 49 U.S.C. § 13902(a)(1)(A); *Pub. Citizen*, 541 U.S. at 766. The agency was not statutorily authorized to consider environmental concerns. Thus, the Court found that the environmental

---

[2]The criteria at issue in *Home Builders* can be found at 33 U.S.C. § 1342(b)(1)-(9).

impact statement would serve no purpose because the agency "lack[ed] the power to act on whatever information might be contained in the [statement]" and therefore the agency action would not have a "reasonably close causal relationship" to negative environmental consequences. *Pub. Citizen*, 541 U.S. at 767–68. The Court held that the agency need not have complied with the environmental impact statement requirement because it did not have the discretion to prevent the certifying of motor carriers based on environmental concerns, given "its limited statutory authority[.]" *Id.* at 770.

The bulk of the agency's work here is to determine if the pipeline operator has the necessary means to prevent, minimize, or mitigate environmental damage from a potential worst case discharge. The agency's approval of a response plan would therefore provide what was lacking in *Public Citizen*—a "reasonably close causal relationship between the agency action and environmental effects, including a worst case discharge, stemming from a potential spill." *Alaska Wilderness*, 811 F.3d at 1117 (Gould, J., dissenting) (internal quotation marks and citations omitted). *Public Citizen* does not control this issue but gives further reason why the agency is required to prepare an environmental impact statement.

Thus, in my view, Congress did not want the administrative agency to be captured by the oil pipeline business by rote consideration of only a narrowly defined checklist, but rather required a discretionary judgement by the administrative agency to ensure that a response plan gives protection "to the maximum extent practicable" to our manifold environmental resources. I would therefore affirm the district court's grant of summary judgment.