FILED
United States Court of Appeals
Tenth Circuit

April 8, 2021

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NATURAL RESOURCES DEFENSE
COUNCIL; SOUTHERN UTAH
WILDERNESS ALLIANCE; THE
WILDERNESS SOCIETY,

     Plaintiffs - Appellants,

v.

JOELLE MCCARTHY, in her official
capacity as the Richfield field office
manager; UNITED STATES BUREAU OF
LAND MANAGEMENT; UNITED
STATES DEPARTMENT OF THE
INTERIOR,

     Defendants - Appellees.

------------------------------

STATE OF UTAH,

     Intervenor - Appellee.

No. 20-4064

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 4:19-CV-00055-DN)**
_____

Joseph J. Bushyhead, Southern Utah Wilderness Alliance, Salt Lake City, Utah (Stephen
H.M. Block and Laura E. Peterson, Southern Utah Wilderness Alliance, Salt Lake City,
Utah; Sharon Buccino, Natural Resources Defense Council, Washington, DC, with him
on the briefs), appearing for Appellants.

Andrew M. Bernie, United States Department of Justice, Environment and Natural Resources Division, Washington, DC (Jonathan D. Brightbill, Principal Deputy Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, Kevin W. McArdle, United States Department of Justice, Environment and Natural Resources Division, Washington, DC, with him on the briefs), appearing for Appellees.

_____

Before **HARTZ**, **BRISCOE**, and **CARSON**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

At issue in this case is whether the Bureau of Land Management (BLM) is required to conduct an environmental analysis under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, when it re-opens an area that it had temporarily closed to off-highway vehicles (OHVs) pursuant to its authority under 43 C.F.R. § 8341.2(a). In 2006, the BLM closed a portion of the Factory Butte area in Utah to OHVs due to their adverse effects on the endangered Wright fishhook cactus. The BLM lifted that closure order in 2019 and re-opened the area to OHV use, but did not perform any kind of environmental analysis under NEPA before doing so. The Plaintiffs filed suit pursuant to 28 U.S.C. § 1331, alleging violations of NEPA and the Administrative Procedure Act (APA), 5 U.S.C. § 500, *et seq.* The Plaintiffs challenged the BLM's decision to re-open, arguing that a NEPA analysis was required. The district court disagreed and dismissed their complaint for failure to state a claim upon which relief can be granted. The Plaintiffs now appeal, and exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

2

# I

## A. Statutory and Regulatory Background

The BLM manages public lands under the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701, *et seq*. FLPMA directs the BLM to manage public lands "under principles of multiple use and sustained yield." *Id.* § 1732(a). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put . . . ." *Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1128 (10th Cir. 2006) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004)). To assist in the management of public lands, the BLM prepares comprehensive resource management plans (RMPs). 43 U.S.C. § 1712(a). As is relevant to this case, RMPs designate public lands as "either open, limited, or closed to off-road vehicles." 43 C.F.R. § 8342.1.

When developing an RMP, an important step for the BLM is the completion of an environmental analysis under NEPA. "NEPA requires all agencies that propose a 'major federal action' that significantly affects the quality of the environment to prepare an environmental impact statement ('EIS') that describes the environmental impact of the action[,] unavoidable adverse environmental effects[,] [and] alternatives to the action," among other things. *Carpenter*, 463 F.3d at 1131 (quotations omitted); 42 U.S.C. § 4332(2)(C). A "major [f]ederal action" is one "with effects that may be major and which are potentially subject to [f]ederal control and responsibility." 40 C.F.R. § 1508.18

3

(2019).[1] The development of an RMP is a "major federal action," and as such, the BLM

is required to prepare an environmental analysis on the matter. 43 C.F.R. § 1601.0–6;

*State of Utah v. Babbitt*, 137 F.3d 1193, 1214 (10th Cir. 1998). Amendments to an RMP

likewise require environmental analysis under NEPA. 43 C.F.R. § 1610.5–5; *Carpenter*,

463 F.3d at 1131. "If the impact of the major federal action on the environment is

uncertain, the agency must prepare an environmental assessment ('EA') to determine

whether the impact will be significant such that an EIS is required." *Carpenter*, 463 F.3d

at 1131. Once an RMP is finalized and approved, FLPMA directs the BLM to "manage

the public lands . . . in accordance with the [RMP]." 43 U.S.C. § 1732(a).

But this directive is not FLPMA's only mandate. FLPMA also requires the BLM

to "take any action necessary to prevent unnecessary or undue degradation of the lands."

*Id.* § 1732(b). Accordingly, in 1979 the BLM, following executive orders issued by

Presidents Nixon and Carter regarding damage to public lands caused by OHVs,

promulgated a regulation governing temporary closure of public lands to OHV use

separate from the RMP process. That regulation reads in pertinent part:

> [W]here the authorized officer determines that off-road vehicles are causing
> or will cause considerable adverse effects upon soil, vegetation, wildlife,
> wildlife habitat, cultural resources, historical resources, threatened or
> endangered species, wilderness suitability, other authorized uses, or other
> resources, the authorized officer shall immediately close the areas affected

---

[1] This version of the regulation was in effect in 2019 when the BLM lifted the temporary closure order that is at issue in this case. Accordingly, it is the relevant definition of "major federal action" for this case, since the recently promulgated regulation defining "major federal action," which took effect September 14, 2020, does not operate retroactively. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *De Niz Robles v. Lynch*, 803 F.3d 1165, 1172 (10th Cir. 2015).

to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

43 C.F.R. § 8341.2(a).

Section 8341.2(a) "creates a separate duty to close [public lands] without regard to the [land use] designation process." *Carpenter*, 463 F.3d at 1130. Therefore, even if an RMP designates an area as open to OHV use, the BLM "shall immediately close" that area if it determines that OHV use is "causing or will cause considerable adverse effects." 43 C.F.R. § 8341.2(a). We have held that such temporary closure orders under § 8341.2(a) are not amendments to an RMP's land use designations that require environmental analysis under NEPA. *Carpenter*, 463 F.3d at 1135–37.[2] However, we have not previously addressed the question presented here: whether the BLM's decision to lift a temporary closure order and return an area to its open designation requires an environmental analysis under NEPA.

## B. Factual Background

The Factory Butte area, located on federal public lands in Wayne County, Utah, is home to the Wright fishhook cactus. The Wright fishhook cactus has been listed as an endangered plant species under the Endangered Species Act since 1979. The Factory

---

[2] Our holding in *Carpenter* was based exclusively on our conclusion that a temporary closure order under § 8341.2(a) was not an amendment to an RMP. We did not address whether "the issuance of a closure order pursuant to 43 C.F.R. § 8341.2(a) constitutes either a 'proposal' or a 'major Federal action'" under NEPA because the Plaintiffs did not clearly raise those arguments. *Carpenter*, 463 F.3d at 1136 n.4 (10th Cir. 2006). At any rate, the Plaintiffs here do not take issue with *Carpenter*'s result: that a temporary closure order does not require environmental analysis.

Butte area is not only where the Wright fishhook cactus is located, but the area is also host to many visitors using cross-country OHVs like motorcycles, all-terrain vehicles, and four-wheel drive trucks.

In 1982, the BLM approved the Henry Mountains Management Framework Plan[3] for roughly 1.9 million acres of land, including the Factory Butte area. Despite OHV use in the area causing "unsightly scars" such that "undue and unnecessary degradation" may have been occurring, the 1982 Management Framework Plan designated the Factory Butte area as open for cross-country OHV use. Aplt. App. at 22–23.

In 2006, a BLM survey of cacti species in the area indicated that OHV use was negatively impacting threatened and endangered species of cacti, specifically the Wright fishhook cactus. Based on this information, the BLM's authorized officer "determined that OHV use in the area is causing or will cause adverse effects to threatened and endangered plant species." Notice of Off-Highway Vehicle (OHV) Travel Restriction for Factory Butte Area, UT, 71 Fed. Reg. 55009 (Sept. 20, 2006). The BLM accordingly invoked its authority under 43 C.F.R. § 8341.2(a) and closed 142,023 acres of the Factory Butte area to cross-country OHV use. *Id.*; Aplt. App. at 25. The closure order was to remain in effect until the conditions threatening the cacti species were sufficiently addressed or until the BLM's Richfield Field Office completed its new RMP. The closure did not affect 2,600 acres within the Factory Butte area known as Swing Arm City.

---

[3] Before FLPMA and during the transition period after FLPMA's passage, RMPs were known as Management Framework Plans. *See* 43 C.F.R. § 1610.8.

In 2008, the BLM's Richfield Field Office released a Proposed RMP and a Final Environmental Impact Statement (Final EIS). The Proposed RMP designated three cross-country OHV "play areas," where cross-country OHV travel would be allowed: 5,800 acres around Factory Butte,[4] 2,600 acres in Swing Arm City, and 100 acres in Caineville Cove Inn. Notwithstanding this designation, the Proposed RMP explained that the 2006 temporary closure order of the Factory Butte and Caineville Cove Inn areas would remain in effect until the BLM signed a Record of Decision approving the RMP because OHVs around Factory Butte were still "causing . . . adverse effects on [threatened and endangered] plant species in the area." Aplt. App. at 27. The Final and Approved 2008 RMP continued to designate the Factory Butte area as open to OHV use, but it did not lift the temporary closure order. Rather, consistent with § 8341.2(a), the closure order was to remain in effect until the BLM ensured that "infrastructure [was] in place and a monitoring program enacted to protect threatened and endangered cacti" and the temporary closure order was "formally rescinded by the authorized officer." *Id.* at 82.

Starting in 2009, the BLM conducted annual monitoring of the Wright fishhook cactus within the closed Factory Butte area. In 2010, the U.S. Fish and Wildlife Service

---

[4] The Final and Approved 2008 RMP is unclear on the exact area around Factory Butte that is designated open. In some places, the RMP says the area encompasses 5,800 acres, Aplt. App. at 85, 86; in others, the RMP says 5,300 acres. *Id.* at 102, 103. The 2019 BLM press release announcing the lifting of the temporary closure order indicated that the area around Factory Butte was only 5,300 acres (resulting in a 5,400-acre re-opening when combined with the 100 acres in Caineville Cove Inn). It is therefore unclear whether 500 acres around Factory Butte remain designated open but temporarily closed or whether there was a technical oversight in the RMP and only 5,300 acres were ever designated as open.

7

issued a biological opinion predicting that the most likely impacts caused by opening the Factory Butte area would be indirect impacts from OHVs: increased airborne dust and particulates, changes in pollinator-plant interactions, and increased illegal OHV use leading to habitat fragmentation and degradation. The BLM continued its monitoring of the Wright fishhook cactus through 2018.

In April 2019, the BLM submitted a memorandum to the U.S. Fish and Wildlife Service stating that the BLM had complied with the requirements of the 2010 biological opinion and additional conservation measures. The BLM sought the concurrence of the U.S. Fish and Wildlife Service in this assessment. The BLM further expressed its intent to move forward with rescinding the 2006 temporary closure order and opening the Factory Butte area to cross-country OHV use. The BLM then sent a follow-up memorandum requesting changes to the 2010 biological opinion and associated monitoring plan. Specifically, the BLM requested "new thresholds for OHV disturbance within [the] Wright fishhook cactus habitat," changes to the "the point at which [the] BLM [wa]s required to reinitiate consultation with the [U.S.] Fish and Wildlife Service based on impacts to the endangered cactus," and "modifications to [the BLM's] Wright fishhook cactus monitoring obligations." *Id.* at 28–29. Although the record is unclear on whether these proposed changes increased or decreased the level of protection of the Wright fishhook cactus, we can infer that the proposed changes corresponded with the minimum level of protection necessary to avoid jeopardizing the Wright fishhook cactus. On May 20, 2019, the U.S. Fish and Wildlife Service accepted the proposed changes and

concluded that opening the Factory Butte area to cross-country OHV use was not likely to jeopardize the Wright fishhook cactus.

Two days later, the BLM issued a press release announcing that it was lifting the 2006 temporary closure order and opening the play areas in "Factory Butte (5,300 acres) and Caineville Cove (100 acres)" to cross-country OHV use. Press Release, Bureau of Land Mgmt., Richfield Field Off., After 10 Years of Extensive Monitoring BLM Opens 5,400 Acres to OHV Recreation (May 22, 2019), available at https://www.blm.gov/press-release/blm-opens-5400-acres-ohv. The BLM subsequently produced a three-page "Memo to File" documenting its decision. As is relevant here, the BLM did not conduct an environmental analysis under NEPA or provide the opportunity for public comment before lifting its closure order.

## II

The Plaintiffs—Natural Resources Defense Council, Southern Utah Wilderness Alliance, and The Wilderness Society—filed a complaint in the United States District Court for the District of Utah for declaratory and injunctive relief against Defendant Joelle McCarthy, in her official capacity as the manager of the BLM Richfield Field Office, the BLM, and the U.S. Department of Interior (collectively, "the BLM"). The State of Utah later intervened as a Defendant. The Plaintiffs alleged that the BLM violated NEPA and the APA by failing to analyze the environmental consequences of its action to lift the temporary closure order and open the Factory Butte area to cross-country OHV use. The Plaintiffs requested that the court set aside the BLM's decision to lift the

Factory Butte closure order and re-impose the closure order until the agency complied with NEPA.

The BLM filed a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The BLM argued that the lifting of the temporary closure order and re-opening of the Factory Butte area to OHV use was a non-discretionary act required by law, and therefore NEPA does not apply.

The district court agreed and granted the BLM's motion to dismiss. Specifically, the district court reasoned that because the BLM's decision to impose a temporary closure order under 43 C.F.R. § 8341.2(a) is non-discretionary under our decision in *Carpenter*, and therefore exempt from NEPA analysis, the decision to lift the temporary closure order "is also a nondiscretionary action of the BLM which is exempt from . . . NEPA." Aplt. App. at 112. Pointing to the plain text of the regulation, the district court explained:

> Under § 8341.2(a), the BLM has authority to determine that OHV's "are causing or will cause considerable adverse effects." The BLM also has authority to determine that "the adverse effects have been eliminated and measures implemented to prevent recurrence." But in both instances, once these determinations are made, the regulation mandates the BLM's action.

*Id.* (citations omitted).

The district court further explained that its reading of the regulation complied with the overall public land management scheme under FLPMA. The district court noted that "[§] 8341.2(a) creates a separate duty to close [public lands] without regard" to an RMP's designation of those lands as open to OHV use. *Id.* (quoting *Carpenter*, 463 F.3d at 1130). Indeed, the district court reasoned, our decision in *Carpenter* exempting

10

temporary closure orders from NEPA analysis allows the BLM to quickly close an area under § 8341.2(a) and comply with FLPMA's mandate to "take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* at 113 (quoting *Carpenter*, 463 F.3d at 1136); *see also* 43 U.S.C. § 1732(b). In the district court's view, likewise exempting the BLM's re-opening of an area from NEPA analysis allows the RMP's designation of that area to resume promptly, complying with FLPMA's countervailing mandate to "manage the public lands . . . in accordance with the [RMP]." *Id.* (quoting 43 U.S.C. § 1732(a)). The district court thus concluded that the entire temporary closure process under § 8341.2(a)—both closing and opening—is a non-discretionary process that exists separately from the RMP and is therefore exempt from NEPA analysis. *See id.* at 114.

The district court dismissed the Plaintiffs' complaint with prejudice and the Plaintiffs timely appealed.

## III

We review the district court's grant of a Rule 12(b)(6) motion de novo. *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1234 (10th Cir. 2020). Although at this stage "we must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff," *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014), the sufficiency of the Plaintiffs' factual allegations is not at issue in this case. This appeal presents a question of regulatory construction, which we review de novo. *Bd. of Educ. of Gallup-McKinley Cnty. Schs. v. Native Am. Disability Law Ctr., Inc.*, 959 F.3d 1011, 1013 (10th Cir. 2020).

11

The related question of whether NEPA applies to the BLM's lifting of a temporary closure order is also subject to de novo review. *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150–51 (D.C. Cir. 2001) ("Because NEPA's mandate is addressed to all federal agencies, the [agency]'s determination that NEPA is inapplicable . . . is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute.").

We note the Plaintiffs in this case did not challenge the 2008 RMP's designation of the Factory Butte area as open to OHV use. Nor do they challenge at this juncture the merits of the BLM's decision to lift the temporary closure order, i.e., whether adequate measures were in place to protect threatened and endangered cacti. The Plaintiffs argue only that the BLM was required to perform environmental analysis under NEPA before lifting the temporary closure order of the Factory Butte area.

Environmental analysis under NEPA is subject to a "rule of reason," such that it is only required when it would provide information that influences an agency's decision-making process involving a "major federal action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *see also Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988) (explaining that "the distinguishing feature" of a "major federal action" is an agency's "ability to influence or control the outcome in material respects"), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992) (en banc). Accordingly, NEPA applies only where an agency action is discretionary. But where an agency action is non-discretionary and mandated by law, environmental analysis "would serve no purpose," and NEPA does not apply. *Pub.*

12

*Citizen*, 541 U.S. at 767 (quotations omitted); *accord Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1262–63 (10th Cir. 2001) (collecting cases holding that "NEPA compliance is unnecessary where the agency action at issue involves little or no discretion on the part of the agency" and concluding that NEPA analysis was not required in the case at hand and indeed "would have been pointless" because the federal agency had no discretion and was mandated by statute to take a certain action). As discussed above, our decision in *Carpenter* held that the decision to temporarily close public lands under 43 C.F.R. § 8341.2(a) is non-discretionary. *Carpenter*, 463 F.3d at 1130 ("[S]uch closures are nondiscretionary: the BLM 'shall immediately close the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.'" (quoting 43 C.F.R. § 8341.2(a)) (emphasis omitted). As a result, a temporary closure order is exempt from NEPA. *See Sac & Fox Nation of Mo.*, 240 F.3d at 1262–63.

The issue in this case thus boils down to whether the BLM's decision to *lift* a temporary closure order under 43 C.F.R. § 8341.2(a) is likewise a non-discretionary action, such that environmental analysis under NEPA is not required. Invoking the text of the regulation and its alleged protective purpose in the larger statutory scheme, the Plaintiffs argue (1) the BLM retains discretion to lift the temporary closure order even after it determines the "adverse effects are eliminated and measures implemented to prevent recurrence," and (2) the BLM's determination that "the adverse effects are eliminated and measures implemented to prevent recurrence" is also itself discretionary. In either case, the Plaintiffs contend, environmental analysis under NEPA is required. In

13

contrast, the BLM says the regulation is symmetrical. The BLM argues NEPA analysis is not required at any point because the agency has no discretion to temporarily close an area, and no discretion to keep the closure order in place once the requisite determination has been made. Additionally, the determination that "the adverse effects are eliminated and measures implemented to prevent recurrence" is not an open-ended act of discretion; rather, just like the initial determination that OHVs are "causing or will cause adverse effects" in the first place, it is a judgment triggering mandatory action under the regulation. We believe the BLM presents the better reading of the regulation and conclude that the lifting of the temporary closure order is non-discretionary. As a result, the BLM is not required under NEPA to conduct further environmental analysis before lifting a temporary closure order where the relevant RMP designates the area as open to OHV use.

## A. The Lifting of the Temporary Closure Order is Non-Discretionary

When interpreting regulations, "we begin our analysis by examining the plain language of the text of the regulation, giving the words their ordinary meaning." *Bd. of Educ. of Gallup-McKinley Cnty. Schs.*, 959 F.3d at 1013. "If the meaning of the text is clear, our endeavor is at an end, and we must enforce the regulation in accordance with its plain meaning." *Id.*

The relevant part of the temporary closure regulation reads:

[W]here the authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects . . . the authorized officer shall immediately close the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

14

43 C.F.R. § 8341.2(a).

The Plaintiffs say the mandatory "shall" applies only to the closure order and that there is no countervailing mandate to re-open closed lands to OHV use, since the re-opening clause is introduced by the word "until." In their view, the word "'until' signals the conditions that must be satisfied prior to lifting a travel closure, not an event upon which a closure lifts automatically." Aplt. Br. at 18. But this goes against an ordinary reading of the regulation, specifically of the word "until." "Until" can be "used as a function word to indicate continuance (as of an action or condition) to a specified time," or as a conjunction meaning "up to the time that." *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/until (last visited March 24, 2021). In either sense, the plain meaning of "until" is that the activity or situation that precedes the word ends at the specified time that follows. The examples used by the Plaintiffs' cited dictionary bear this out: if a person "stayed until morning," that means they left in the morning, not that they could leave in the morning. *Id.* Likewise, if "play continued until it got dark," then play stopped at dark; it did not continue into the night. *Id.* Applying that understanding here, § 8341.2(a) requires the BLM to lift a temporary closure order once it finds that "the adverse effects are eliminated and measures implemented to prevent recurrence." The regulation plainly does not allow the BLM to maintain the temporary closure order after it has made the requisite finding.

## B. The Determination Triggering the Lifting of the Temporary Closure Order is Also Non-Discretionary

The Plaintiffs alternatively argue that the BLM's determination that "the adverse effects are eliminated and measures implemented to prevent recurrence," 43 C.F.R. § 8341.2(a), is itself a discretionary act requiring NEPA analysis. Although this presents a closer question than the Plaintiffs' first argument, we are ultimately unpersuaded due to instructive Supreme Court precedent, out of circuit authority, and our own decision in *Carpenter*.

In *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650–51 (2007), the Supreme Court interpreted a provision of the Clean Water Act providing that the EPA "shall" approve a transfer of its pollution discharge permitting authority to state officials if the state met nine specified criteria.[5] The

---

[5] To transfer permitting authority under the statute, the EPA had to determine whether a state had the ability:

(1) to issue fixed-term permits that apply and ensure compliance with the CWA's substantive requirements and which are revocable for cause; (2) to inspect, monitor, and enter facilities and to require reports to the extent required by the CWA; (3) to provide for public notice and public hearings; (4) to ensure that the EPA receives notice of each permit application; (5) to ensure that any other State whose waters may be affected by the issuance of a permit may submit written recommendations and that written reasons be provided if such recommendations are not accepted; (6) to ensure that no permit is issued if the Army Corps of Engineers concludes that it would substantially impair the anchoring and navigation of navigable waters; (7) to abate violations of permits or the permit program, including through civil and criminal penalties; (8) to ensure that any permit for a discharge from a publicly owned treatment works includes conditions requiring the identification of the type and volume of certain pollutants; and (9) to ensure that any

specific issue was whether the Endangered Species Act's (ESA) requirement that federal agencies consult with environmental agencies before taking any action that may jeopardize an endangered or threatened species—which, importantly, has been interpreted similarly to the environmental analysis requirement under NEPA, *see id.* at 667–68—added a tenth criteria before the EPA could transfer permitting authority to a state. *Id.* at 662. Concluding that the later-enacted ESA did not amend or repeal by implication the Clean Water Act, the Supreme Court held that consultation under the ESA was not required. The Court reasoned that the provision of the Clean Water Act "does not just set forth minimum requirements for the transfer of permitting authority; it affirmatively mandates that the transfer 'shall' be approved if the specified criteria are met." *Id.* at 663 (emphasis omitted). The Court then rejected the argument "that the EPA's decision to authorize a transfer is not entirely mechanical [and] that it involves some exercise of judgment as to whether a State has met the criteria set forth in [the statute]." *Id.* at 671. The Court acknowledged that "the EPA may exercise some judgment in determining whether" a state had met the listed statutory criteria, but concluded that "the statute clearly does not grant [the EPA] the discretion to add another entirely separate prerequisite to that list." *Id.* Therefore, consultation under the ESA was not required.

---

industrial user of any publicly owned treatment works will comply with certain of the CWA's substantive provisions.

*Home Builders*, 551 U.S. at 651 n.2 (citing 33 U.S.C. § 1342(b)(1)–(9)).

17

The Sixth Circuit recently expanded on this seemingly metaphysical distinction between judgment and discretion in *National Wildlife Federation v. Secretary of the United States Department of Transportation*, 960 F.3d 872 (6th Cir. 2020). In that case, the Sixth Circuit explained that "[t]he clearest case of 'discretion' is when an agency doesn't have to act—for instance, if a statute says 'may' rather than 'must' or 'shall.'" *Id.* at 876. The Sixth Circuit further explained that "even mandatory actions . . . [may] be 'discretionary' under the Endangered Species Act (and related statutes) when the statutory criteria are so open-ended that they leave the agency significant flexibility on *when* or *how* to act." *Id.* (emphasis in original). But "this does not mean that any amount of open-endedness makes a decision 'discretionary.'" *Id.* at 876–77 (emphasis omitted). An "agency action need not be 'entirely mechanical' for the agency to still be exercising only 'judgment,' not 'discretion.'" *Id.* at 876 (quoting *Home Builders*, 551 U.S. at 671). Thus, under the Sixth Circuit's view of the Supreme Court's decision in *Home Builders*, if an "agency is required by [law]" to take a certain action once specified "triggering events have occurred," the action is not discretionary, even though the agency may exercise some judgment in determining whether the "triggering events have occurred." *Id.* (quotations omitted). Put simply, "[d]iscretion and judgment are not the same thing." *Id.* at 874. Only discretionary acts require consultation under the ESA or analysis under NEPA. *Id.* at 875, 879. Acts of judgment do not.

Applying that distinction to a different provision of the Clean Water Act than the one at issue in *Home Builders*, the divided panel in *National Wildlife Federation*

held that the reasoning of *Home Builders* controlled. Once the relevant agency

determined, in its judgment, that an operator of an oil pipeline demonstrated that it

met six enumerated statutory criteria to address the risk of a potential oil spill, the

agency was required to approve the oil pipeline's response plan under the Clean

Water Act. *Id.* at 877.[6] The agency was therefore not required to consult with other

agencies under ESA or conduct environmental analysis under NEPA before

approving these plans. *Id.* at 879, 880. The dissent concluded otherwise, believing

that certain statutory criteria referring to a pipeline operator's ability to remove

discharge to the "maximum extent practicable" amounted to "an amorphous, moving

---

[6] The plans had to satisfy the following criteria in the judgment of the agency:

> (i) be consistent with the requirements of the National Contingency Plan and Area Contingency Plans;
> (ii) identify the qualified individual having full authority to implement removal actions, and require immediate communications between that individual and the appropriate Federal official and the persons providing personnel and equipment pursuant to clause (iii);
> (iii) identify, and ensure by contract or other means approved by the President the availability of, private personnel and equipment necessary to remove to the maximum extent practicable a worst case discharge (including a discharge resulting from fire or explosion), and to mitigate or prevent a substantial threat of such a discharge;
> (iv) describe the training, equipment testing, periodic unannounced drills, and response actions of persons on the vessel or at the facility, to be carried out under the plan to ensure the safety of the vessel or facility and to mitigate or prevent the discharge, or the substantial threat of a discharge;
> (v) be updated periodically; and
> (vi) be resubmitted for approval of each significant change.

*Nat'l Wildlife Fed'n*, 960 F.3d at 874–75 (citing 33 U.S.C. § 1321(j)(5)(D)).

target." *Id.* at 881–82 (Merritt, J., dissenting). In the dissent's reading, the decision of whether that requirement had been met "involve[d] expertise, discretion, and judgment." *Id.* at 882 ("The agency does not simply check the box for a 'triggering event' like the agency in *Home Builders*."); *Alaska Wilderness League v. Jewell*, 811 F.3d 1111, 1116 (9th Cir. 2015) (Gould, J., dissenting from denial of rehearing en banc) (reaching the same conclusion).

Relying upon the above analysis from *Home Builders* and *National Wildlife Federation,* we conclude the BLM's determination of whether "the adverse effects are eliminated and measures implemented to prevent recurrence" more closely resembles judgment than it does discretion. Accordingly, when that determination is made, the BLM need not conduct environmental analysis before lifting a temporary closure order. As the Sixth Circuit noted, the Supreme Court's decision in "*Home Builders* makes clear that agency action need not be 'entirely mechanical' for the agency to still be exercising only 'judgment,' not 'discretion.'" *Nat'l Wildlife Fed'n*, 960 F.3d at 876 (quoting *Home Builders*, 551 U.S. at 671).

The Plaintiffs nevertheless contend that *Home Builders* and *National Wildlife Federation* are distinguishable because, in their view, those cases merely involved an evaluative judgment of whether *another party* had satisfied enumerated statutory criteria. This case is different, the Plaintiffs urge, because the "BLM's role is not simply evaluative: the agency must itself formulate and implement protective measures before lifting a closure," Aplt. Reply Br. at 8, which are discretionary acts that "form an inseparable part of the agency's ultimate decision." *Id.* at 15. But even

20

accepting that the BLM must itself formulate and implement protective measures, that does not make the subsequent decision to lift a temporary closure order discretionary.

Indeed, we believe the examples of discretion relied upon by the Plaintiffs are quite different from the situation here. This is not a case where the criteria "are so open-ended that they leave the agency significant flexibility on *when* or *how* to act." *Nat'l Wildlife Fed'n*, 960 F.3d at 876 (emphasis in original). Section 8341.2(a) does not charge the BLM "with developing . . . criteria" for when or how to lift a temporary closure order. *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1142 (11th Cir. 2008) (concluding that consultation under ESA was required because the statutory scheme where FEMA managed its own flood insurance program "b[ore] little resemblance to the scheme in [*Home Builders*], where no discretion was found"); *Stand Up for Cal. v. U.S. Dep't of the Interior*, 959 F.3d 1154, 1164 (9th Cir. 2020) (holding that the Department of the Interior retained discretion for NEPA purposes when formulating criteria to allow tribal gaming). Nor does the regulation instruct the BLM to consider criteria as vague and wide-ranging as "the public convenience and necessity." *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) (concluding agency was required to prepare EIS when evaluating applications to construct and operate interstate pipelines). The BLM does not have "discretion to impose terms and conditions" on its decision to lift a temporary closure order. *RESTORE: The North Woods v. U.S. Dep't of Agric.*, 968 F. Supp. 168, 175 (D. Vt. 1997) (holding that NEPA applied to a land exchange because the Forest

21

Service possessed "discretion to impose terms and conditions on the transaction and to approve or disapprove the transaction based on the acceptability of the lands to be acquired"). And as discussed above, this is plainly not a case where the agency was "authorized, but not required, to make" a certain decision, and therefore possessed total discretion to act. *Friends of Columbia Gorge, Inc. v. U.S. Forest Serv.*, 546 F. Supp. 2d 1088, 1102 (D. Or. 2008) (holding that NEPA analysis was required).

Unlike the situations described, an environmental analysis here would not influence whether the BLM lifts a temporary closure order. Section 8341.2(a) mandates lifting a temporary closure order when the BLM, in its judgment, makes the requisite finding that "the adverse effects are eliminated and measures implemented to prevent recurrence." An environmental analysis under NEPA is not required where an agency action is mandated by law, and the environmental analysis "would serve no purpose." *Pub. Citizen*, 541 U.S. at 767 (quotations omitted). The relevant EIS was prepared in creating the 2008 RMP. The BLM's mandatory decision to lift the temporary closure order does not trigger the need for a new EIS.

Additionally, our reading of the regulation is guided by how we have interpreted the BLM's determination to close an area to OHV use in the first place. *Carpenter* held, and the parties do not dispute, that a temporary closure is non-discretionary and NEPA analysis is not required even though the BLM must first determine that OHV use is "causing or will cause considerable adverse effects." *Carpenter*, 463 F.3d at 1130. We conclude the determination to re-open—that "the adverse effects are eliminated and measures implemented to prevent recurrence"—

22

should be treated the same way. In other words, if the determination triggering the closure order is not discretionary, then neither is the determination triggering the re-opening. We therefore disagree with the Plaintiffs' asymmetrical reading that § 8341.2(a) operates as a one-way ratchet where the BLM "exercise[s] judgment when implementing a closure order, [but] exercises discretion when lifting one." Aplt. Reply Br. at 16 (emphases omitted).

As further support, our reading of the regulation makes sense within the larger statutory and regulatory scheme. Section 8341.2(a) serves as a mechanism to *temporarily* close public lands. The closure is exempt from NEPA analysis to allow the agency to act quickly and "timely comply with its statutory mandate [under FLPMA] to 'take any action necessary to prevent unnecessary or undue degradation of the lands.'" *Carpenter*, 463 F.3d at 1136 (quoting 43 U.S.C. § 1732(b)). Likewise exempting the re-opening from NEPA analysis enables the BLM to timely comply with its countervailing statutory mandate under FLPMA to "manage the public lands . . . in accordance with the [RMP]," 43 U.S.C. § 1732(a), which, in this case, designated the Factory Butte area as open to cross-country OHV use.

In contrast, the Plaintiffs' interpretation of the regulatory scheme is untenable. In their view, the BLM's statutory duty to "prevent unnecessary or undue degradation of the lands," *id.* § 1732(b), trumps all. Under their theory, the closure order is appropriately exempt from NEPA analysis to take urgent action to protect endangered species, but "there is no symmetrical urgency to reintroduce OHV use to a closed area," making an exemption from NEPA analysis for that decision

23

inappropriate. Aplt. Br. at 29. But we believe reading § 8341.2(a) this way transforms it into an all-consuming provision that would allow the BLM to maintain a temporary closure order indefinitely, even after the agency makes the requisite determination triggering a re-opening and despite an area's open designation under the relevant RMP. We have already rejected this position as contravening the text and structure of the regulation. But it also cuts against the apparent purpose of § 8341.2(a) as a mechanism for *temporary* closure orders. And it subordinates the RMP, which serves as the backdrop for the entire land management scheme under FLPMA. We believe our reading of the regulation, which accommodates both temporary closure orders and an RMP's open designation, harmonizes FLPMA's multiple mandates and "strik[es] a balance among the many competing uses to which land can be put . . . ." *Carpenter*, 463 F.3d at 1128.

Finally, the factual circumstances highlighted by the Plaintiffs to argue that the BLM believed it had discretion are largely irrelevant to this purely legal question. That the 2008 RMP contemplated keeping the closure order in place until certain conditions were met merely comports with the requirements of § 8341.2(a). That the 2008 RMP also indicated the BLM may choose to revise the Factory Butte area's open designation in the future did not prevent the agency from lifting the closure order in 2019, nor did it constrain the agency in maintaining the open designation. And that the BLM consulted with the U.S. Fish and Wildlife Service on whether it had met the requirements of the Service's 2010 biological opinion (presumably in

24

accordance with the ESA) does not mean that the BLM was required to conduct environmental analysis under NEPA as a matter of law.

In short, the regulation's text and place in the overall land management scheme, our decision in *Carpenter*, as well as instructive Supreme Court precedent and out of circuit guidance dictate the result here: where the relevant RMP designates an area as open to OHV use, lifting a temporary closure order of that area under 43 C.F.R. § 8341.2(a) is non-discretionary and does not require NEPA analysis.

## IV

For those reasons, we AFFIRM the district court's dismissal of the Plaintiffs' complaint.